**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **FELIPE GOMEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 8437** |
| | ) | |
| **DETECTIVE STEVE RIHANI, OFFICER** | ) | |
| **H. GUITERREZ, a/k/a OFFICER H.** | ) | |
| **GUTIERREZ, DETECTIVE CORRAL,** | ) | |
| **OFFICER C.A. STENZAL, CITY OF** | ) | |
| **CHICAGO d/b/a CITY OF CHICAGO** | ) | |
| **POLICE DEPARTMENT, DETECTIVE** | ) | |
| **J. KAMINSKI, DETECTIVE J.** | ) | |
| **ATAMIAN, and VILLAGE OF** | ) | |
| **SCHAUMBURG d/b/a SCHAUMBURG** | ) | |
| **POLICE DEPARTMENT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge[1]:

Felipe Gomez has sued two Village of Schaumburg police officers (John Atamian and Joseph Kaminski); four Chicago police officers (Steve Rihani, Humberto Gutierrez, Amalio Corral, and Chris Stenzel); the Village of Schaumburg (the Village); and the City of Chicago (the City). Gomez alleges that the officer defendants falsely arrested him in violation of the Fourth Amendment and also maliciously prosecuted him in violation of Illinois law. He also asserts claims against the City and the Village for indemnification of the officers under Illinois statute. The defendants have moved for summary judgment

---

[1] This case was recently reassigned to the undersigned judge's docket.

on all of Gomez's claims.[2]  For the reasons stated below, the Court grants summary

judgment in favor of all defendants.

## Background

The following facts are undisputed except where otherwise noted.[3]  Gomez is the

former owner of Gomez Recycling, an auto parts recycling business that he founded in

2008.  Before it shut down, Gomez Recycling was located at 4600 West Chicago

Avenue in Chicago.  Gomez is a native Spanish speaker with limited English fluency.

Prior to Gomez's arrest in 2015, SPD had received reports of potential criminal activity

at Gomez Recycling.  In July 2013, a semi-truck trailer containing approximately 40,000

pounds of aluminum rims was reported missing in the Chicago area.  Police later found

the missing rims and trailer on Gomez Recycling property after they had been

presented for sale to the company.  On November 4, 2014, law enforcement officers

placed two individuals at Gomez Recycling into custody for possession of stolen

catalytic converters.

In October 2013, SPD detectives Atamian and Kaminski identified Jonathan Kelly

as a suspect in a catalytic converter theft that took place in the Village earlier that

month.  On April 21, 2014, Atamian and Kaminski arrested Kelly outside of the Skokie

---

[2] The "Village" defendants and the "City" defendants have filed separate motions for summary judgment.  This opinion jointly addresses both motions.

[3] The defendants argue that the Court should strike and disregard portions of Gomez's response briefs, his responses to their statements of undisputed fact, and his statement of additional material facts because his filings did not comply with the requirements of Local Rule 56.1.  *See* Village Defs.' Reply at 1-5.  "[T]he decision whether to apply [Local Rule 56.1] strictly or to overlook any transgression is one left to the district court's discretion."  *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (citation omitted).  The Court opts not to penalize Gomez for noncompliance with Local Rule 56.1, and doing so would make no difference in the outcome in any event.

courthouse for the October 2013 theft.  After the officers drove him to the area where the October 2013 theft occurred, Kelly admitted that he was responsible for the theft and told the detectives that he regularly sold stolen catalytic converters to Gomez Recycling.  Atamian testified during his deposition that Kelly informed them that he had taken catalytic converters to Gomez Recycling "over a hundred times."  Atamian Dep. at 83:19-84:3.  Kelly told Atamian and Kaminski that when he brought catalytic converters to Gomez Recycling, he informed the employees that the converters were "cuffed"— street slang for "stolen"—and that some of them were "hot to the touch" because they had been removed from a running car.  *Id*. at 85:11-22.  Atamian further testified that when he showed Kelly a photo of Gomez, Kelly identified him as "the money man" at the business who oversaw the other employees and provided the money that employees used to pay for the catalytic converters Kelly provided.  Village Defs.' L.R. 56.1 Stmt. ¶ 15.  Atamian and Kaminski drove with Kelly to Gomez Recycling, and Kelly provided additional information about the company.

Kelly identified two additional businesses that accepted stolen catalytic converters, and Atamian and Kaminski also drove past the locations of these two businesses.  Atamian testified that they did not stop at those locations because the department had previously conducted periodic surveillance on those businesses, and on the day of Kelly's arrest the businesses "looked closed" because "[t]here was no activity there at all."  Atamian Dep. at 36:24-37:6; 88:19-89:1.

After returning to the SPD police station, Atamian performed a background check on Kelly and found that he had a "long, extensive criminal history."  *Id*. at 30:24-31:4.  Atamian stated that he believed Kelly would be a good confidential informant because

his name frequently appeared along with Gomez Recycling on an e-mail thread that included multiple law enforcement agencies sharing intelligence regarding local catalytic converter thefts.

In April 2014, Atamian contacted CPD police sergeant Robert Wheeler to share his findings regarding the SPD investigation of Gomez Recycling. At the time of Atamian's initial communication, CPD was actively investigating Gomez Recycling. Following this initial communication, CPD detectives Atamian, Wheeler, and Rihani met with Cook County Assistant State's Attorney (ASA) Anne Head to discuss the possibility of CPD and SPD launching a joint investigation into potential criminal activity at Gomez Recycling. ASA Head was initially assigned to the operation to assist the police by issuing subpoenas, reviewing search warrants, and providing support for other legal matters. That spring the SPD and the CPD Asset Forfeiture Unit Money Laundering Team initiated an undercover operation focused on Gomez Recycling called "Operation Hot Pipe."

On July 16, 2014, Kelly signed a proffer agreement with the Cook County State's Attorney's Office (CCSAO) under which he agreed to serve as a confidential informant for SPD. Part of Kelly's role as a confidential informant was to introduce Officer Guttierez, an undercover officer for CPD, to Gomez Recycling employees through two "controlled sales." A controlled sale occurs when "a law enforcement agency makes a plan to sell something to someone they believe to be committing a criminal act as part of a sale." City Defs.' L.R. 56.1 Stmt. ¶ 19. Atamian does not recall sharing information about Kelly's criminal background with CPD. CPD officers never performed a background check on Kelly.

4

The first Operation Hot Pipe controlled sale occurred on September 2, 2014. During the controlled sale, Kelly introduced Gutierrez to Osmar Gonzalez, a Gomez Recycling employee, as "Sergio Diaz Contreras." After Gutierrez presented catalytic converters to Gonzalez, Gutierrez said that he did not know what type of car the catalytic converters came from because he served as the "lookout" while his friend removed the catalytic converter from the vehicle. Kelly and Gutierrez conducted a second controlled sale with Gonzalez at Gomez Recycling on September 9, 2014. Gutierrez stated that during both controlled sales, he informed Gonzalez that he did not have valid proof of his identity, and Gonzalez allowed him to use other individuals' identification cards to complete the transaction.

On October 8, 2014, Rihani prepared a petition seeking court authorization to conduct consensual overhears. Rihani also prepared an affidavit in support of the petition. Atamian provided "opening verbiage" detailing Kelly's relationship to Gomez Recycling and the history of SPD's investigation of the business for use in the affidavit. Atamian Dep. at 62:24-63:12. Rihani's affidavit contains a summary of SPD's interactions with Kelly as well as a short description of the two controlled sales Gutierrez conducted with Kelly. The CCSAO is responsible for reviewing consensual overhear petitions; ASA Head reviewed and signed Rihani's petition. Rihani obtained court authorization for the use of an eavesdropping device. Gutierrez utilized an audio and video recording device during twelve controlled sales conducted at Gomez Recycling.

On October 16, 2014, Gutierrez conducted a controlled sale in the presence of Gomez. Gutierrez told Gomez that he wanted to bring a truckload of catalytic converters to the business. While referencing the truck, Gutierrez used the Spanish

5

word "chingadazo," a term that Gutierrez "understood to be Spanish slang to mean 'big stolen load.'" Gutierrez Decl. ¶¶ 35; 46. During the conversation Gutierrez also used the Spanish term "madrazo," another word that Gutierrez understood as slang for stolen goods. *Id.* ¶ 47. Gomez told Gutierrez that Gomez Recycling would offer him the best possible price for the purchase of the converters. Gutierrez continued to use the terms "chingadazo" and "madrazo" during conversations with Gomez and other Gomez Recycling employees. Gutierrez also referred to a number of the catalytic converters he presented for sale as "caliente," another term that Gutierrez asserts is Spanish slang for "stolen." City Defs.' L.R. 56.1 Stmt. ¶¶ 66-67.

In addition to the use of slang terms, Gutierrez states that he repeatedly indicated to Gomez Recycling employees that he stole the catalytic converters he possessed through his accounts of how he obtained the converters. Gutierrez says, for example, that he told Gonzalez a story about police officers chasing him as he attempted to obtain catalytic converters and expressed to Gonzalez that he was concerned about being stopped by the police at the Gomez Recycling entrance. Gutierrez also says that he repeatedly asked Gomez Recycling employees to conduct transactions in private. Gutierrez further states that on March 31, 2015, he called Gomez to confirm that the transaction scheduled for the following day could be conducted "discreetly and away from everyone else in the business." Gutierrez Decl. ¶ 144. Gutierrez also says that he told Gomez during that call that he had "jumped a fence multiple times to steal the catalytic converters" that he intended to sell to Gomez Recycling. *Id.* ¶ 145.

Gomez disputes Gutierrez's description of the events that took place over the

course of Operation Hot Pipe. Gomez testified during his deposition that he had no knowledge of Kelly, Gutierrez, or any other client selling stolen catalytic converters to Gomez Recycling. Gomez Dep. at 173:5-18; 174:3-7. Gomez stated that although Gutierrez may have told other employees that he stole the catalytic converters he presented for sale, the employees never shared this information with Gomez. Gomez also disputes Gutierrez's interpretation of several Spanish words. Gomez testified that he did not consider a catalytic converter being "hot to the touch" or called "caliente" an indication that the converter was stolen. *Id*. at 173:22-174:2. He further testified that he understood the terms "chingadazo" and "madrazo" to mean a "hit," and that he does not consider those words street slang for "stolen" items. Gomez Dep. at 84:24-85:17.

CPD Officer Stenzel drafted a complaint in support of a request for a warrant to search Gomez, Gomez's residence, and Gomez Recycling. The complaint includes a brief history of the Operation Hot Pipe investigation, a short description of each controlled sale conducted at Gomez Recycling, and summaries of several phone conversations between Gutierrez and Gomez Recycling employees. To prepare the complaint Stenzel reviewed various CPD reports regarding Operation Hot Pipe. ASA Head reviewed the complaint, and a Cook County judge authorized the search warrant on March 31, 2015.

On April 1, 2015, CPD officers executed the search warrant at Gomez Recycling as well as Gomez's residence. Gomez was arrested outside the property and was charged with theft, organizing a continuing financial crimes enterprise and committing a continuing financial crime enterprise. Officers discovered stolen items on Gomez Recycling property during the search, and additional charges were later filed against

Gomez.  Gomez filed a motion to suppress the consensual overhear recordings, and the trial judge granted the motion.  On September 20, 2019, the prosecutor entered a *nolle prosequi* on several of the charges against Gomez.  On September 27, 2019, Gomez was found not guilty on the remaining charges.

On December 26, 2019, Gomez filed the complaint in the present suit, alleging false arrest in violation of the Fourth Amendment for arresting him without probable cause on April 1, 2015 (count one); conspiracy to deprive Gomez of his constitutional rights (count two); municipal liability against the City & the Village (counts three and four); indemnification of the officers under Illinois statute (counts five and six); malicious prosecution (count seven); and intentional infliction of emotional distress (count eight). This Court (by Judge Chang, to whom the case was then assigned), dismissed the municipal liability claims.  *See Gomez v. Rihani*, No. 19 C 8437, 2021 WL 1165095, at *4-5 (N.D. Ill. Mar. 26, 2021).  Gomez voluntarily dismissed his claim for intentional infliction of emotional distress.

The defendants have moved for summary judgment on all the remaining claims.

## Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A genuine dispute of material facts exists only if "sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook Cnty. Sheriff's Dep't.*, 602 F.3d 845, 849 (7th Cir. 2010) (citation omitted).  On a motion for summary judgment, the Court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party.

8

*Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citation omitted).

## A.    Evidentiary disputes

Before considering the merits of the defendants' motions for summary judgment, the Court addresses the parties' various evidentiary disputes. Gomez argues in his response brief that because the Cook County judge overseeing his criminal trial granted his motion to suppress the consensual overhear recordings, this Court should not consider any evidence that the defendants identify from those recordings as "facts." Pl.'s Resp. to Village Defs.' Mot. for Summ. J. at 12. Gomez says the judge ruled that there was no probable cause for the consensual overhears. *See id*.; Pl.'s Stmt. of Add'l Mat. Facts ¶ 183. In support of this assertion, he cites to Rihani and Head's deposition testimony. But during their depositions, Rihani stated he did not know the grounds for the trial court judge's ruling on the eavesdropping device, Rihani Dep. at 56:18-57:12, and Head stated that she recalled certain consensual overhears being excluded at trial but did not identify probable cause as the basis for the exclusion. Head Dep. at 77:5-15. Gomez provides no factual or legal support for the proposition that this Court cannot consider evidence obtained from the consensual overhears based on the trial judge's ruling. And even if Gomez is right about the basis for the ruling, his argument is foreclosed by Seventh Circuit precedent. The Seventh Circuit has held that the exclusionary rule does not apply in civil suits against police officers. *Martin v. Marinez*,

934 F.3d 594, 599 (7th Cir. 2019). The defendants may therefore utilize the consensual overhear recordings to establish probable cause even if the state trial court found the recordings were obtained unlawfully.

Gomez also asserts that numerous documents relied upon by the defendants, including police and investigation reports, constitute inadmissible hearsay. "An out-of-court statement is hearsay if it is offered 'to prove the truth of the matter asserted in the statement.'" *United States v. Graham*, 47 F.4th 561, 567 (7th Cir. 2022) (quoting FED. R. EVID. 801(c)(2)). A court may not consider inadmissible hearsay evidence at the summary judgment stage. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). But the Seventh Circuit has concluded that in civil cases, police reports generally qualify for the public records exception to the hearsay rule found in Federal Rule of Evidence 803(8). *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Gomez also challenges the admissibility of statements included in the police reports that are attributed to Kelly, SPD's undercover informant. The hearsay exception as applied to police reports generally applies only to an officer's factual findings and firsthand impressions, not statements provided to an officer by a third-party. *Id.* But none of Kelly's statements are offered to prove that Gomez or Gomez Recycling was actually involved in any alleged criminal activity. Rather, the defendants reference Kelly's statements only to show what defendant officers relied upon when conducting their criminal investigation. Statements that are offered to show the effect on the listener rather than for their truth are not hearsay. *Graham*, 47 F.4th at 567; *Patterson v. Burns*, 670 F. Supp. 2d 837, 845 (S.D. Ind. 2009) (concluding third party statements included in police report were not offered for their truth and were therefore admissible). The Court overrules Gomez's

request to exclude the SPD and CPD police reports.

The defendants argue that the Court should not consider an affidavit submitted by Dennis Martinez. Martinez is an official interpreter for Cook County whom Gomez retained to provide a translation of three of the controlled sale transactions that Gutierrez recorded. Under Federal Rule of Civil Procedure 26(a)(2), a summary judgment affidavit may not contain expert testimony that has not been previously disclosed. *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007). The defendants assert that Gomez failed to timely disclose Martinez as a witness and that any evidence that Gomez seeks to offer from Martinez should therefore be stricken. Because the defendants raised this argument in their reply briefs, Gomez has not had a chance to respond or to provide a justification for his alleged failure to disclose. Because striking this evidence would make no difference in the outcome, this Court opts not to strike Martinez's affidavit.

**B.    Section 1983 claims**

**1.    False arrest**

Gomez brings his federal claims against the officers under 42 U.S.C. § 1983. To prevail on a section 1983 claim, the plaintiff must demonstrate that the defendant deprived him of a right secured by the Constitution or federal law. *Thurman v. Village of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). Gomez claims that the officer defendants falsely arrested him in violation of his rights under the Fourth Amendment.

To prevail on his false arrest claim, Gomez must show that he was arrested without probable cause. *Fleming v. Livingston County*, 674 F.3d 874, 878 (7th Cir. 2012). Probable cause exists where the law enforcement officer is "aware of facts and

circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Probable cause "does not require proof of a crime" but does require more than "bare suspicion." *Rainsberger v. Benner*, 913 F.3d 640, 648-49 (7th Cir. 2019).  The existence of probable cause is typically a jury question, but summary judgment is appropriate if there is "no room for a difference of opinion concerning the facts" or the "reasonable inference to be drawn from them." *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 473 (7th Cir. 1997).

"[A] plaintiff claiming that he was arrested without probable cause carries the burden of establishing the absence of probable cause." *McBride v. Grice*, 576 F.3d 703, 706 (7th Cir. 2009).  Gomez argues that the defendants lacked probable cause to arrest him because the consensual overhear affidavits and the search and seizure warrant complaint contained untruthful statements and omitted material information. "Affidavits supporting wiretap applications are judged by the same standards as those supporting conventional search warrant applications, [that is,] whether they set forth probable cause." *United States v. Turner*, No. 11 C 50209, 2012 WL 34261, at *2 (N.D. Ill. Jan. 6, 2012) (citing *United States v. Vargas*, 116 F.3d 195, 197 (7th Cir. 1998)); *People v. Calgaro*, 348 Ill. App. 3d 297, 301, 809 N.E.2d 758, 761 (2004) (concluding that the Illinois reasonable cause standard for obtaining wiretap authorization is equivalent to the federal probable cause standard).

The defendants contend that in support of his argument regarding lack of probable cause, Gomez improperly focuses on the consensual overhear affidavits and

the search warrant complaint.  A defendant can establish that a search warrant violated the Fourth Amendment by showing that the affidavit used to procure the warrant "contained a false material statement or omitted a material fact."  *United States v. Lowe*, 516 F.3d 580, 584 (7th Cir. 2008).  To make this showing, the plaintiff must demonstrate that the officer preparing the affidavit "knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer, and that the false statements were necessary to the judicial officers' determinations that probable cause existed for the arrests."  *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).  If Gomez adduces evidence that the officer defendants obtained authorization for the consensual overhears or the search and seizure warrant without probable cause, then his subsequent arrest would give rise to a legitimate false arrest claim.  *See London v. Guzman*, 26 F. Supp. 3d 746, 751-54 (N.D. Ill. 2014) (analyzing the plaintiff's claim that the execution of a constitutionally invalid search warrant resulted in a false arrest); *see also Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 923 (N.D. Ill. 2007) ("The probable cause defense for a false arrest claim is inapplicable if probable cause was based upon fabricated evidence.").

### a.    Consensual overhear affidavits

First, Gomez contends that Rihani's consensual overhear affidavits fail to "properly apprise the Court of the situation."  Pl.'s Resp. to Village Defs.' Mot. for Summ. J. at 11.  Gomez points out that the consensual overhear orders listed only felony theft as an offense under investigation.  *See* Village Defs.' L.R. 56.1 Stmt., Ex. 42 at 1, 3. But Gomez cites no legal authority in support of the proposition that every offense that is later charged against the defendant must be included in a confidential overhear order

issued as part of the investigation of that charge. Gomez's bare assertion that certain information is "missing" from the affidavits is insufficient to establish that probable cause is lacking due to the absence of that information. *See Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1063 (7th Cir. 2020) ("Arguments that are underdeveloped, cursory, and lack supporting authority are waived.").

Gomez also notes that he was not listed as an individual to be recorded on the consensual overhear orders. But these orders state that there is "reasonable cause for believing that that the felony offense of theft has been and/or will be committed" by various Gomez Recycling employees as well as "any unknown co-conspirators." *See* Village Defs.' L.R. 56.1 Stmt., Ex. 42 at 21. Because Gomez was involved in the controlled sale transactions that were the subject of the criminal investigation, he is included within the scope of the consensual overhear orders as a potential co-conspirator. Furthermore, an officer need not include the names of all participants in the conversation to be recorded to receive authorization for consensual overhears. *See* 725 Ill. Comp. Stat. 5/108A-5; *see also United States v. Gibson*, 996 F.3d 451, 462 (7th Cir. 2021) ("[P]robable cause for a search warrant need not be tied to any particular person.").

Additionally, Gomez notes that Rihani stated that the affidavit "does not contain all of the information known to law enforcement concerning this investigation." Village Defs.' L.R. 56.1 Stmt., Ex. 42 at 7. Illinois law only requires that a consensual overhears affidavit includes the "facts and circumstances relied upon by the applicant to justify his belief that an order should be issued," not every fact regarding the alleged criminal activity that is known to the individual supplying the affidavit. 725 Ill. Comp.

Stat. 5/108A-3(2).

Gomez also contends that Rihani's affidavit did not comply with certain requirements for law enforcement interceptions of private communications provided by section 2518(1)(c) of the Omnibus Crime Control and Safe Streets Act of 1968 (Wiretap Act). This section provides, in relevant part, that an "application for an order authorizing or approving the interception of a wire, oral, or electronic communication" must contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed." 18 U.S.C. § 2518(1)(c). Again, Gomez does not provide any supporting legal authority demonstrating that the failure to comply with this statutory requirement negates a probable cause finding. *See Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 419 (7th Cir. 2019) ("As briefed, the argument is terse, free of legal citation, and vague. It is therefore waived."). And at least one Illinois court has determined that the section of the federal statute upon which Gomez relies addresses only nonconsensual wiretaps and therefore does not apply to applications for consensual overhears. *See People v. Keller*, 2020 IL App (2d) 170750-U, ¶ 78 ("It is difficult to see how federal law that is not applicable to the conduct at issue before a court could preempt state law that pertains to such conduct."); *see also People v. Coleman*, 227 Ill. 2d 426, 433-35, 882 N.E.2d 1025, 1029-30 (2008) (comparing the Wiretap Act to Illinois eavesdropping statutes).

Second, Gomez asserts that Rihani's affidavit contains false or misleading statements. Specifically, Gomez challenges Rihani's inclusion of information that he learned from Atamian's description of his conversations with Kelly as well as Guttierez's reports regarding the controlled sales. It is undisputed that Rihani did not perform a

15

background check on Kelly or conduct an independent interpretation of the controlled sale recordings prior to preparing the consensual overhear affidavits.  But as a law enforcement officer, Rihani was entitled to "reasonably rely on information provided by other officers."  *Fitzgerald v. Santoro*, 842 F. Supp. 2d 1064, 1068 (N.D. Ill. 2012) (quoting *Duran v. Sirgedas*, 240 F. App'x 104, 114 (7th Cir. 2007)).  Rihani participated in the initial communications with SPD prior to the commencement of Operation Hot Pipe and was aware that SPD was the primary agency responsible for obtaining and managing the confidential informant.  Rihani also knew that Gutierrez was a direct participant in the controlled sales that he described in the consensual overhear affidavit. Gomez identifies no evidence in support of the argument that Rihani's reliance on the information provided by other law enforcement officers was unreasonable.

Furthermore, Rihani fully described the sources of the information he included in the consensual overhear applications.  In his affidavits, Rihani explained that Atamian and Kaminski were the only officers present for Kelly's admission that he had previously sold stolen catalytic converters to Gomez Recycling employees.  *See, e.g.*, Village Defs.' L.R. 56.1 Stmt., Ex. 42 at 8.  Rihani also described the process by which Kelly became a confidential informant for SPD and SPD subsequently communicated to CPD the information that Kelly provided.  *Id.* at 8-10.  No reasonable trier of fact could conclude that Rihani's consensual overhear affidavits included false or misleading information or had material omissions.

### b. Search warrant complaint

Gomez argues that the search warrant complaint lacked probable cause because Stenzel was not directly involved in the controlled sales or the conversations with the

confidential informant that he described in the complaint.   Specifically, Gomez contends that much of the information included in the complaint was "based upon hearsay from other officers."  Pl.'s Resp. to City Defs.' Mot. for Summ. J. at 11.  But the Seventh Circuit has "repeatedly stated that a search warrant need not be based on first-hand observations." *United States v. Hollingsworth*, 495 F.3d 795, 805 (7th Cir. 2007); *United States v. Schubert*, 528 F. App'x 613, 616 (7th Cir. 2013) ("An affidavit in support of a search warrant can rely on information from other officers and other hearsay if sufficiently reliable.").  It is undisputed that to prepare the complaint, Stenzel "sp[o]k[e] with Rihani, Corral, Atamian and Kaminski multiple times."  City Defs.' Resp. to Pl.'s Stmt. of Add'l Mat. Facts ¶ 183.   Stenzel also testified during his deposition that he obtained information about the controlled sales he included in the complaint from "supplementary reports prepared by the undercover officers involved in each controlled sale."  Stenzel Dep. at 77:21-78:3.  No reasonable trier of fact could conclude that Stenzel included false or misleading information in the search and seizure warrant complaint.

### c.    Confidential informant

Gomez argues that Kelly's reliability and credibility were not sufficiently supported in the consensual overhear affidavits or the search and seizure warrant complaint.  This argument lacks merit.

When an informant supplies information in support of a probable cause finding, courts determine the legitimacy of the probable cause finding through a "totality-of-the-circumstances inquiry" focused on "the informant's reliability, veracity, and basis of knowledge." *Junkert v. Massey*, 610 F.3d 364, 368 (7th Cir. 2010).  The factors

considered in this totality-of-the-circumstances inquiry include: (1) the nature of police efforts to corroborate the informant's information; (2) whether the information was based on the informant's first-hand observations; (3) the amount of detail the informant provided; (4) the amount of time between the events described by the informant and the warrant application; and (5) whether the informant appeared before the judge who issued that warrant. *Junkert*, 610 F.3d at 368. "No one factor is determinative and a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability." *United States v. Searcy*, 664 F.3d 1119, 1122 (7th Cir. 2011) (internal quotation omitted).

Kelly did not appear before the judges who issued the consensual overhears or search warrant orders, and it is unclear from the record when the transactions Kelly described to Atamian and Kaminski took place. But the information Kelly provided carries other indicia of reliability. Kelly obtained the information he provided to SPD officers through his direct participation in several catalytic converter transactions at Gomez Recycling. He provided the names and roles of various Gomez Recycling employees, described the layout of the property, and gave a detailed description of how Gomez Recycling employees received, processed, and priced the stolen catalytic converters that he brought to the business. Village Defs.' L.R. 56.1 Stmt., Ex. 43 at 2. Kelly's "first-hand knowledge," "inclusion of specific, granular details" and provision of information "against [his] own penal interest" all bolster his credibility as an informant. *Edwards v. Joliff-Blake*, No. 13 C 4558, 2017 WL 1134473, at *4 (N.D. Ill. Mar. 27, 2017), *aff'd*, 907 F.3d 1052 (7th Cir. 2018). Furthermore, the officers corroborated the information Kelly provided through Atamian's surveillance efforts as well as the two

controlled sales that took place before Rihani submitted the first consensual overhear affidavit. *See* Village Defs.' L.R. 56.1 Stmt., Ex. 43 at 3; Pl.'s Resp. to Village Defs.' Mot. for Summ. J. at 7.

Gomez asserts that the fact that Kelly provided this information in an attempt to avoid arrest undermines his credibility. But judges "are aware that informants are frequently facing charges and hoping for deals." *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1061 (7th Cir. 2018) (citation omitted). Furthermore, the consensual overhear affidavits disclosed that Kelly was informed that if he provided truthful information about his sale of stolen catalytic converters at Gomez Recycling, he would not be arrested for the October 13, 2014, catalytic converter theft at that time. Village Defs.' L.R. 56.1 Stmt., Ex. 43 at 2. This is not a case where the affidavit involved the "wholesale omission of damaging credibility information." *United States v. Glover*, 755 F.3d 811, 818 (7th Cir. 2014). Although Stenzel did not include this information in the search warrant complaint, "the issuing judge need not have evidence of the motive if the account is otherwise reliable." *Edwards*, 2017 WL 1134473, at *6. Similarly, Gomez notes that Kelly's criminal history was not included in the affidavits or complaint, but the Seventh Circuit has stated that "an informant's criminality does not in itself establish unreliability." *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006). And Gomez presents no support for the proposition that the exclusion of this fact rises to the level of a material omission. Kelly provided a detailed, first-hand account of several unlawful catalytic converter transactions in which he had participated. There is no evidence to suggest that the state court judge's probable cause finding would have been impacted by the inclusion of information about Kelly's additional criminal activity. *Id.* (noting that

omission of confidential informant's criminal history did not undermine probable cause finding).

The majority of the factors that the Seventh Circuit has established to determine informant reliability weigh in favor of finding that the affidavits and the complaint were supported by probable cause. No reasonable trier of fact could conclude that the officer defendants' reliance on Kelly's information amounted to reckless disregard for the truth.

### d. Translation

Gomez contends that the translations of the consensual overhear recordings were inaccurate because Gutierrez "admitted that the recordings of the conversations were not understandable due to the noise of the business and could not be reviewed for his report." Pl.'s Resp. to City Defs.' Mot. for Summ. J. at 8. But that is not a fair description of Gutierrez's testimony. Gutierrez testified that when reviewing the audio of the controlled sales for his reports, he learned that "due to the noise of the business, a lot of the conversations were not understandable" from the audio recording. Gutierrez Dep. at 48:9-13. The controlled sale transcripts specifically acknowledge that certain parts of the audio recordings were "unintelligible" to the interpreter, and there is no English translation for those portions of the conversation. *See, e.g.*, Village Defs.' L.R. 56.1 Stmt., Ex. 26 at 6. Gutierrez's testimony does not indicate that he was not able to provide a complete translation of any of the audio recordings, and there is nothing to indicate that he inappropriately translated portions of the audio that were "not understandable."

Gomez also disputes Guttierez's interpretation of several Spanish terms. During multiple conversations with Gomez and other Gomez Recycling employees, Gutierrez

used the Spanish words "madrazo" or "chingadazo" when referencing the catalytic converters that he presented or planned to present to Gomez Recycling for sale. Village Defs.' L.R. 56.1 Stmt. ¶¶ 38-50.  Gutierrez testified during his deposition that these words can "mean a lot of different things," including "a big hit."  Gutierrez Dep. at 45:5-46:1.  But he asserts that in the context of the controlled sales, these words are Spanish slang for "big stolen load."  Village Defs.' L.R. 56.1 Stmt. ¶ 41.  Gutierrez also at times referred to the items he brought to Gomez Recycling as "hot."  City Defs.' L.R. 56.1 Stmt. ¶ 66.  Gutierrez contends that although the literal translation of the Spanish word "caliente" is "hot," it is also a Spanish slang term for stolen goods.  *Id.* ¶ 67.

Gomez testified during his deposition that he does not understand the terms "madrazo," "chingadazo,"  or "caliente" to be slang terms for stolen items.  Gomez Dep. at 84:24-85:7; 85:12-17; 173:22-174:2.  Gomez also presents an affidavit prepared by Dennis Martinez, a Cook County court interpreter who listened to the recorded conversations.  Martinez stated in the affidavit that during the controlled sales that took place on October 16, October 22, and November 5, 2014, Gomez did not engage in conversation with the undercover officers regarding "stolen" items nor "acknowledge that he would purchase a 'stolen' motor vehicle and/or 'stolen' motor vehicle engines." Pl.'s Resp. to Village Defs.' L.R. 56.1 Stmt., Ex. 53 ¶ 7.  Martinez also stated that although the November 5, 2014 recording includes a conversation between the undercover officer and a Gomez Recycling employee about a "hot car," Gomez was not present for that conversation.  *Id.* ¶¶ 8-9.

For the purposes of the present motion, this Court will assume that Martinez presents an accurate description of the audio recordings of the three controlled sales he

reviewed. But even viewing the evidence in the light most favorable to Gomez, he cannot defeat summary judgment based on Gutierrez's translations, because there is no evidence suggesting that Gutierrez "entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that [he] knew would negate probable cause." *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015). Gomez does not argue that Gutierrez was not a qualified Spanish interpreter, knew that the transcripts he provided were not accurate or attempted to mislead his fellow officers about the contents of the controlled sales transactions. In short, there is no evidence from which a reasonable trier of fact could find that Gutierrez's translations or the officers' reliance on them rose to the level of an intentional falsehood or one made with reckless disregard for the truth.

Additionally, Gomez has not shown that Guttierez's translations of these terms were material to the probable cause finding. Gutierrez used additional language to indicate that he stole the catalytic converters in his possession. For example, during a telephone conversation on March 31, 2015, Gutierrez told Gomez that he jumped over a fence multiple times while vacationing in Mexico to obtain the catalytic converters that he planned to sell to Gomez Recycling. City Defs.' L.R. 56.1 Stmt. ¶ 78. Gomez counters that he "disputes the translation of the interaction." Pl.'s Resp. to City Defs.' L.R. 56.1 Stmt. ¶ 78. But Gomez's bare assertion that the accuracy of this translation is disputed, with no supporting evidence or explanation, is insufficient to create a genuine factual dispute regarding the accuracy of the transcript documenting this conversation. *Graber v. Mad Brewer, Inc.*, 773 F. Supp. 2d 765, 768 (N.D. Ind. 2011) ("[Plaintiff]'s general assertions that facts are in dispute are not sufficient to put those facts into

dispute.").

Furthermore, the controlled sales were not the only evidence of criminal activity that CPD and SPD officers relied on in procuring the consensual overhear orders and search and seizure warrant. After Kelly's initial conversation with Atamian and Kaminski, SPD engaged in additional investigative efforts, including conducting surveillance of the Gomez Recycling building and surrounding property. Village Defs.' L.R. 56.1 Stmt., Ex. 43 at 3. And officers at both CPD and SPD had knowledge of potential criminal activity at Gomez Recycling prior to the initiation of Operation Hot Pipe. On October 12, 2012, SPD detectives interviewed a catalytic converter theft suspect who stated that he regularly sold stolen catalytic converters at "a scrap yard with a Hispanic name located on Chicago Avenue near Cicero Avenue." *Id.* at 1. In July 2013, a stolen semi-truck trailer filled with aluminum rims was recovered on Gomez Recycling property. Pl.'s Resp. to City Defs.' L.R. 56.1 Stmt. ¶ 6. In November 2014, two individuals were placed into custody for possession of stolen catalytic converters after presenting the converters for sale at Gomez Recycling. *Id.* All of this information was included in either the consensual overhear affidavits or the search warrant complaint. Village Defs.' L.R. 56.1 Stmt., Ex. 43 at 1.

Gomez suggests that this evidence is irrelevant because he did not have knowledge of the allegedly unlawful transactions taking place at Gomez Recycling. Pl.'s Resp. to City Defs.' L.R. 56.1 Stmt. ¶ 6. But the relevant question is not whether the officer defendants' beliefs about Gomez's involvement in alleged criminal activity were probably true. *See Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) ("The existence of probable cause does not depend on the truth of a complaint of

23

wrongdoing.").  Instead, the relevant question is whether those beliefs were reasonable. *See Fleming*, 674 F.3d at 879.  Here, given Gomez's position as the company's principal and the owner of the site of previous transactions involving stolen goods, it was reasonable for the officers to believe that Gomez had been involved in committing, or was currently involved in committing, an offense at the time that the officers contributed to and prepared the consensual overhears affidavits and search warrant complaint.

Gomez has adduced no evidence that any of the police officers intentionally or recklessly included false statements or omitted material information from the consensual overhear affidavits or the search and seizure warrant complaint.  No reasonable jury could find that Gomez's arrest was not supported by probable cause. The defendants are entitled to summary judgment on Gomez's false arrest claim.

### 2.    Conspiracy

To prevail on a section 1983 conspiracy claim, a plaintiff must "show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm." *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (internal quotation omitted).  For the reasons described above, Gomez has not shown that the defendants violated his Fourth Amendment rights.  Consequently, there is no underlying constitutional violation to support his conspiracy claim.  Furthermore, in support of his conspiracy argument, Gomez only adduces evidence that SPD and CPD officers worked together to "formulate[] a plan" to investigate potential criminal activity at Gomez Recycling.  *See* Pl.'s Resp. to City Defs.' Mot. for Summ. J. at 16.  This evidence is insufficient to allow a reasonable jury to find that the officers entered into an agreement

to violate Gomez's constitutional rights. *See Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (concluding evidence of telephone communications between law enforcement officers amid criminal investigation was insufficient to establish conspiracy). The defendants are entitled to summary judgment on Gomez's Section 1983 conspiracy claim.

**B.     State law claims**

**1.     Malicious prosecution**

Gomez also asserts a state law claim for malicious prosecution. To succeed on this claim, Gomez must prove: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Ritchey v. Maksin*, 71 Ill. 2d 470, 475, 376 N.E.2d 991, 993 (1978).

As this Court discussed above, there is no genuine issue of material fact regarding the absence of probable cause. Gomez's malicious prosecution claim fails on that basis. *Esco v. City of Chicago*, 107 F.4th 673, 683 (7th Cir. 2024).

Furthermore, Gomez has not adduced evidence of malice. Malice is defined as "the initiation of a prosecution for an improper motive." *Bolden v. Pesavento*, 623 F. Supp. 3d 897, 926 (N.D. Ill. 2022) (quoting *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 141, 183 N.E.3d 767, 792). Stenzel testified that at the beginning of the investigation into Gomez Recycling, he found a news report that included an interview with an "alderman or a government official" who stated that Gomez Recycling was contributing to crime in the community and expressed a desire to "get rid of the company." Stenzel

Dep. at 63:24-65:18; City Defs.' Resp. to Pl.'s Stmt. of Add'l Mat. Facts ¶ 189. Gomez also alleges that in 2014, Chicago Police Superintendent McCarthy instructed Chicago Police Area Commanders to "do something about all the recyclers who are taking in the stolen converters." Pl.'s Resp. to City Defs.' Mot. for Summ. J. at 18. Gomez asks this Court to infer from these individuals' alleged statements that Operation Hot Pipe was initiated to target Gomez Recycling rather than to legitimately investigate unlawful conduct. "[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion," *Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018), and that is all that Gomez offers here. He has not presented evidence from which a reasonable trier of fact could infer malice in the filing of charges against him. The defendants are entitled to summary judgment on Gomez's malicious prosecution claim.

### 2. Indemnification

Gomez brings claims against the City and the Village seeking indemnification for the liability of the officer defendants. The Illinois Local Government and Governmental Employees Tort Immunity Act mandates that municipalities pay tort judgments against its agents, 745 ILCS 10/9-102, but this mandate only applies when that agent is liable for the plaintiff's injuries. 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."). Here, because Gomez's constitutional and state law claims have failed, his indemnification claim fails as well. *See Esco*, 107 F.4th at 683 (concluding that the plaintiff's indemnification claim must be dismissed due to the defeat of his Fourth Amendment and malicious prosecution claims). The City and the Village are therefore

entitled to summary judgment on Gomez's indemnification claims.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motions for summary judgment [dkt. nos. 143, 146]. The Clerk is directed to enter judgment stating: Plaintiff's claims against all defendants are dismissed with prejudice.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 23, 2024